UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAGALY CAMACHO et al. ) | |
| ) | Civil Action No. 02-10428-DPW |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| WILLIAM FRANCIS GALVIN, ) | |
| in his official capacity as Secretary of the ) | |
| Commonwealth of Massachusetts, ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A survey of as few as one in eight households in the Chelsea-East Boston region shows that not enough of the Latinos of voting age who live there are American citizens to create a district for the Massachusetts House of Representatives where more of the citizens are Latino than not. Nevertheless, a representative of choice of the Latino voters in the plaintiffs' proposed Second Suffolk district is likely to get elected there—but would not win a majority of the vote in the Second Suffolk district as configured by the Redistricting Act. Because this evidence alone shows both an ability to elect under the first precondition of Thornburg v. Gingles, 478 U.S. 30, 50 (1986), and a dilutive effect under the Equal Protection Clause, summary judgment cannot enter against the plaintiffs, who have also come forward with proof that the Legislature put the Redistricting Act in place for the discriminatory purpose of reducing minority voting strength.

## STATEMENT OF FACTS

### The Demography of Chelsea, East Boston, and Charlestown

East Boston is home to the largest Latino population in the city, see Deposition of Rep. Thomas M. Petrolati ("Petrolati Dep."), April 2, 2003, at 14, 17, 35, Ex. 16, at 6,[1] with nearly 15,000 Hispanics in its total population of 38, 413.[2] See Affidavit of Prof. John E. Harmon ("Harmon Aff.") ¶ 2, Ex. A, at 4. The city of Chelsea, geographically adjacent to East Boston, compare Subst. Am. Compl. ¶ 14 with Ans. ¶ 14, and connected to it by two bridges, see Deposition of Rep. Eugene L. O'Flaherty ("O'Flaherty Dep.") at 83, meanwhile, has 35,080 residents, of whom nearly 17,000, or 48.4 percent, are Latino. See Harmon Aff. ¶ 2, Ex. A, at 4. Since 1990, the Latino population of Chelsea has increased by 88 percent, while that of East Boston has more than doubled. See id. Aside from these similarities in ethnic composition, East Boston and Chelsea share other socioeconomic characteristics. See Declaration of Prof. John R. Logan ("Logan Decl.") ¶ 2, Ex. 1, at 4. For example, the average East Boston resident lives in a census tract where 10 percent of his or her neighbors have a college education and the median income is $31,211, while the tract inhabited by the average Chelsea resident has a median income of $29,907 and a rate of college education of 9 percent. See id. By contrast, in Charlestown, only 11.6 percent of the residents, or 1,764 out of the total of 11,946, are Hispanic. See Harmon Aff. ¶ 2, Ex. A, at 4. In fact, nearly 80 percent of the population of Charlestown is white.[3] See id. Charlestown's median household income of $54,638

---

[1] A true and correct copy of the first page and each other page of each deposition transcript cited herein has been attached to the accompanying Affidavit of Kenneth A. Sansone, Esq. Each exhibit authenticated by deposition testimony and referenced herein has also been attached to the Affidavit, with a tab bearing its exhibit number as assigned at the deposition in question.
[2] The terms "Latino" and "Hispanic" are used interchangeably throughout.
[3] For ease of reference, the term "white" is used throughout to mean "white non-Latino."

makes it considerably more affluent than either Chelsea or East Boston. See Logan Aff. ¶ 2, Ex. A, at 1, 3. The median income, employment rate, and percent of residents who own their homes in Charlestown are all higher than those of Chelsea or East Boston, where more people live below the poverty line than in Charlestown. See id.

### The Latino Political Experience In Chelsea

At the ballot box, the Latino population of Chelsea votes differently than the overwhelmingly white population of Charlestown. See Affidavit of Professor Richard L. Engstrom ("Engstrom Aff.") ¶ 28. For example, in the 2002 Democratic primary for the Massachusetts senate district which includes both Chelsea and Charlestown, Jarrett Barrios, a Latino, received less than 40 percent of the votes cast in Charlestown.[4] See id. ¶ 26. Anthony Galluccio, his white opponent, received more than 50 percent of those votes. See id. Yet Barrios was the overwhelming choice of Hispanic voters in the district, receiving as much as 95 percent of their vote.[5] See id. ¶ 11. Latinos in Chelsea have demonstrated a preference for representation by Latino candidates, particularly in school committee elections. See id. ¶ 28. For example, Gabriel Valerio (a Latino) received more than 70 percent of the Latino vote in 2001. See id. ¶ 14. Magaly Valentin (also a Latino) got 86 percent of the Latino vote in 1997. See id. ¶ 20. Latino voters produced similar results in the 2001 at-large election for Chelsea city council, where Roy Avellaneda (a Latino) received 97 percent of the Hispanic vote. See id. ¶ 23.

---

[4] Similarly, in the 2001 elections, Felix Arroyo—a Latino running against six white opponents for an at-large seat on the Boston city council—finished next-to-last among Charlestowners, garnering less than 15 percent of their vote. See Engstrom Aff. ¶ 27.
[5] In this election, Galluccio had the support of Rep. Eugene O'Flaherty, whose district, the Second Suffolk, is at issue in this case. See O'Flaherty Dep. at 106. Rep. O'Flaherty testified that, while he remembered some issues in the Barrios-Galluccio race, the only issue on which the candidates disagreed was "something about charter schools." Id. at 108-109.

-3-

GSDOCS-1241294-1

The Latino residents of Chelsea have also endured a longstanding pattern of obstacles to their full participation in the political process. See Declaration of Prof. Carol Hardy-Fanta ("Hardy-Fanta Decl."), ¶ 2, Ex. 1, at 2. First, under the city's at-large system for electing members of the Chelsea school committee, only one Latino has ever been elected to the body, despite the fact that the majority of children in the Chelsea public schools are Latino.[6] See Affidavit of Juan Vega ("Vega Aff.") ¶ 5. This results from white voters in Chelsea voting as a bloc against Latino candidates, who nevertheless receive a high degree of support from the Latino electorate. See Engstrom Aff. ¶ 28.

Second, of the city's five wardens for each of the 1997, 1999, 2000, 2001, and 2002 elections, the Chelsea city clerk, could identify but one Latino.[7] See Deposition of Robert H. Bishop, April 17, 2003 ("Bishop Dep.") at 26-39. Similarly, none of the ten clerks who worked at the polls during any of those five elections was Hispanic. See id. Latinos have thus experienced difficulties in voting in municipal elections, including being asked for identification at the polls on a more frequent basis than whites, being told that their names did not appear on the voter list, see Vega Aff. ¶ 3-4, and having to interact with poll workers who do not speak or understand Spanish. See Bishop Dep. at 32-33. Chelsea's wardens and clerks have been trained on issues affecting Latino voters at the polls only once, for twenty or thirty minutes, and at that happened only at the insistence of Hispanic organizations in the city in 2001.[8] See id. at 67-71. Experiences

---

[6] Despite requests from the Latino community, the city council has refused to take the necessary steps to switch to a system of electing school committee members by district. See Vega Aff. ¶¶ 5-6.

[7] One warden is responsible for overseeing the polling places—each of which is overseen by a clerk—in each ward on election day. See Bishop Dep. at 28.

[8] Bishop also testified that Chelsea has a tradition of allowing wardens and clerks to appoint their successors—and that he has never encouraged the appointment of a Latino for either of these positions. See Bishop Dep. at 40-41.

of this kind have discouraged Latinos from participating in the political process.[9] See Declaration of Prof. Thomas E. Patterson ("Patterson Decl.") ¶ 2, Ex. 1, at 2. Such a pattern of discriminatory conduct also reduces the inclination of Latino non-citizens to naturalize and otherwise hinders their pursuit of citizenship. See id. ¶ 3, Ex. B, at 1.

## The Development of the Redistricting Act

Before the passage of the Redistricting Act, Chelsea's Commission on Hispanic Affairs (the "Commission") and other members of the city's Latino community asked the Joint Special Committee on Redistricting,[10] co-chaired by Rep. Petrolati, not to divide Chelsea into multiple house districts. See Def. Statement Undisp. Facts ¶ 11, Ex. A. In a September 19, 2001 letter to Rep. Petrolati, the Commission proposed that all of Chelsea be placed in a single district together with one precinct (necessary because the population of Chelsea was slightly less than that needed to constitute a district unto itself) from an adjacent area of East Boston. See id. That district would have had more minorities than whites.[11] See Harmon Aff. ¶ 2, Ex. A, at 10-11. Among the 28,132 people of voting age in the proposed district, 43 percent would have been Hispanic, while nearly 56 percent would have been minority. See id.

However, in the Redistricting Act which became law on November 8, 2001, the Legislature placed three-quarters of Chelsea and all of Charlestown together in one

---

[9] Latinos in Chelsea also suffer race-based discrimination in housing, health, education, and employment. See Hardy-Fanta Decl. ¶ 2, Ex. 1, at 2.
[10] The Committee's official moniker was the "Joint Special Committee Established to Make an Investigation and Study of a New Division of the Commonwealth into Congressional Districts, Forty Senatorial Districts, Eight Councilor Districts and One Hundred Sixty Representative Districts." See Petrolati Dep. at 14, 16-17, Ex. 16, cover page.
[11] As an alternative plan, the letter proposed that all of Chelsea be combined with one adjacent precinct from Charlestown, which also would have resulted in a majority-minority district. See Def. Statement Undisp. Facts ¶ 11, Ex. A.

GSDOCS-1241294-1

district, known as the Second Suffolk.[12] Compare Subst. Am. Compl. ¶¶ 17, 19 with Ans. ¶¶ 17, 19. Significantly, two of the four Chelsea precincts excluded from the Second Suffolk, and placed together with Revere in the Sixteenth Suffolk, had Hispanic populations exceeding 40 percent.[13] See Harmon Aff. ¶ 2, Ex. A, at 8. In the Second Suffolk, only 43 percent of the residents of voting age are minorities—and Hispanics comprise only 32.3 percent of the voting-age population. See id. at 8-9. This creates an atmosphere in which whites, who form a two-thirds majority of the district's voting age population, will usually defeat the choices of their Latino counterparts at the ballot box. See Engstrom Aff. ¶ 29. For example, a reaggregation of returns from the 2002 state senate race demonstrates that, had Barrios run for that office from a district consisting solely of Charlestown and those parts of Chelsea which make up the Second Suffolk, he would not have received a majority of the vote. See id. ¶ 30.

Placing five precincts from East Boston in a district together with eleven precincts from Chelsea, however, creates a district where a Latino candidate has a more reasonable chance of defeating a white opponent. See id. ¶ 31 (analyzing "plaintiffs' illustrative district," described at Harmon Aff. ¶ 2, Ex. A, at 11-12). Barrios, for example, would likely have won a majority of the votes in this district (the "proposed district"). See id. In the proposed district, 14,120 of the 27,841 residents of voting age, or nearly 51 percent, are Latino, and 17,547, or 63 percent, are minorities. See Harmon Aff. ¶ 2, Ex.

---

[12] The Committee also received a letter from Charlestown resident Denise Marie Devlin, accompanied by a number of postcards signed by other Charlestown residents, asking that Charlestown not be divided into multiple House districts. See Petrolati Dep. at 67-69, Exs. 19A and 19B.
[13] The Redistrict Act changed the existing Second Suffolk by removing precincts 2 and 3 of Chelsea ward 4 and precinct 4 of Chelsea ward 3 to the Sixteenth Suffolk, and adding Chelsea ward 3, precinct 1 and ward 1, precinct 4, which were formerly part of the Sixteenth Suffolk. Compare St. 1993, c. 273.

GSDOCS-1241294-1

A, at 12. Furthermore, the proposed district satisfies traditional redistricting principles of compactness and contiguity,[14] and its implementation would involve shifting less than five percent of all precincts in the Commonwealth from the House districts in which they are located under the Redistricting Act.[15] See id. at 13. Latinos make up between 26 and 45 percent of the citizens of voting age in the proposed district. See id. ¶ 10.

In its October 18, 2001 report on the Redistricting Act, the Joint Special Committee claims to have

> conducted a number of public hearings, met with scores of groups representing various constituencies across the commonwealth, spoken with elected officials, attended conferences on the subject of redistricting and reapportionment, and engaged in ongoing correspondence—electronic, print and telephone call—with individuals interested in the redistricting process.

Petrolati Dep. at 14, 17, 35, Ex. 16, at 4. At his deposition in this case, however, Rep. Petrolati (who served as the House chairperson of the Committee) testified that, outside of five public hearings held at different locations across the state, the Committee did not in fact meet with any group in connection with the redistricting process, let alone "scores" as asserted in its report. See id. at 20-21. The Committee also did not engage in any "ongoing correspondence" with members of the public, but simply received written correspondence from them without responding.[16] See id. at 21-22. In fact, the only persons with whom Rep. Petrolati met during the creation of the Redistricting Act (outside of the five public hearings) were each of the members of the House, see id. at

---

[14] Indeed, the proposed district actually hews more closely to accepted redistricting standards designed to maintain the "one person, one vote principle" than the existing Second Suffolk: the total population of the proposed district deviates from the ideal by only 2.5 percent, while that of the enacted Second Suffolk deviates by nearly 5 percent. See Harmon Aff. ¶ 2, Ex. A, at 5, 9, 12.

[15] Charlestown, for example, would join precincts from the North End of Boston in a reconstituted Third Suffolk district under the proposed plan. See Harmon Aff. ¶ 2, Ex. A, at 11 & App. 5.

24-25—including Rep. O'Flaherty of the Second Suffolk, who used the meeting to provide input about his district.[17] See id. at 48-49. Since none of the three Latino members of the House represents a district which includes any part of Suffolk County, the Committee did not speak to any Latino from Chelsea or elsewhere in the county about the development of the Redistricting Act.[18] See id. at 51-53.

## SUMMARY OF ARGUMENT

Defendant contends that none of the preceding facts matters to this case because not enough of the voting-age Latinos in the proposed district are citizens to constitute a majority of voting-age citizens there, based on data extrapolated from a census form distributed to as few as one in eight households. This argument is incorrect for at least three reasons. First, because a Latino-preferred candidate would not win a majority of votes from the Second Suffolk as constituted by the Redistricting Act, but could get elected from the proposed district, the Redistricting Act has the dilutive effect on Latino voting capacity necessary to give rise to an Equal Protection claim based on intentional discrimination—whether or not Latinos constitute a majority of the citizenship voting age population of the proposed district.

Second, the rationale behind the first precondition for liability under section 2 of the Voting Rights Act as set forth in Gingles is that "[u]nless minority voters possess the potential to elect representatives in the absence of the challenged structure..., they cannot

---

[16] Rep. Petrolati also testified—in further contradiction of the language in the Report—that neither he nor anyone on this staff spoke to any member of the public by telephone about the redistricting process. See Petrolati Dep. at 26-27.

[17] In Rep. O'Flaherty's deposition, he testified that he "would like [his] district to stay substantially similar to the district that [he] ran for in 1996 and [he is] currently the representative of today." See O'Flaherty Dep. at 124.

[18] Rep. Petrolati, of course, has refused to identify any non-public communications concerning the formation of the Redistricting Act. See Petrolati's Supp. Mem. Legislative Privilege at 4-5.

claim to have been injured by that structure...." Id. at 50, n. 17. Again, the plaintiffs have come forward with evidence that, in their proposed district, they could elect a representative of their choice, but that, in the existing Second Suffolk, they could not. This fact demonstrates that, absent the Redistricting Act, the plaintiffs have the potential to elect their chosen representative, and sets this case apart from the decisions which have used the ability of the plaintiff minority group to constitute a majority of the citizenship voting age population in a single-member district as a proxy for determining the electoral potential of the group in the absence of other evidence of that potential. Accordingly, the Latino citizenship voting age population of the proposed district does not affect the plaintiffs' claim under section 2 of the Voting Rights Act.

Third, rates of naturalization among Latinos in Chelsea and East Boston remain low as a result of the same kinds of discrimination which keep rates of registration and other forms of political participation low among that minority group. Because the very discrimination at the heart of this case has reduced the number of citizens among the Hispanic community in the proposed district, requiring the plaintiffs to show, nevertheless, a Latino majority of the citizenship voting age population would run contrary to the purposes of the Voting Rights Act—even if they did not have independent evidence of their ability to elect a candidate of choice in the proposed district.

## ARGUMENT

### Point I
### Plaintiffs' Intentional Discrimination Claim Can Go Forward Because The Redistricting Act Will Have Its Intended Dilutive Effect On Latino Voting Strength

It is well-established that, to prevail on a claim of intentional vote dilution under the Equal Protection Clause, a minority group need show only legislative action,

undertaken with discriminatory intent, which creates less opportunity for that group to participate in the political process and to elect legislators of its choice. See, e.g., White v. Regester, 412 U.S. 775, 766 (1973); Whitcomb v. Chavis, 403 U.S. 124, 149 (1971). Plaintiffs have met this test with evidence that a Latino candidate would likely prevail in the proposed district, but would not secure a majority of the votes in the existing Second Suffolk imposed by the Redistricting Act. See Engstrom Aff. ¶ 31. This fact alone distinguishes this case from Latino Political Action Comm. v. City of Boston, 784 F.2d 409 (1st Cir. 1986), which affirmed the District Court's dismissal of claims under both the Act and the Constitution in the "absence of clear proof of an alternative that would have increased the effectiveness of the minority vote…". Id. at 415. Because the plaintiffs have produced clear evidence, in the form of Professor Engstrom's opinion, that the effectiveness of the Latino vote would be increased by the institution of the proposed district, Latino Political Action Committee in no way requires dismissal of their Equal Protection claim, even assuming for the purpose of argument that they could not prevail on their "results-based" claim under section 2.[19]

Defendant's argument to the contrary, as one court has recognized, "would prevent any redress for districting which was deliberately designed to prevent minorities from electing representatives…." Garza v. County of Los Angeles, 918 F.2d 763, 771

---

[19] The extrajurisdictional cases upon which Defendant relies are similarly unavailing. Johnson v. DeSoto Cty. Bd. of Comm'rs, 204 F.3d 1335 (11th Cir. 2000), based its rejection of the plaintiffs' Equal Protection claim on their failure to "establish that an alternative system of districting could exist whereby the black-minority vote could elect its preferred candidates." Id. at 1346; see also Gingles v. Edmisten, (E.D.N.C. 1984) (three-judge court), aff'd sub nom. Thornburg, 478 U.S. 30 (ruling that, although plaintiffs failed to prove section 2 claims, "the direct claims under the fourteenth… amendment remain, and could be established… by proof of a dilutive effect intentionally inflicted"); Skorepa v. City of Chula Vista, 723 F.Supp. 1384, 1392 (S.D. Cal. 1989) ("if plaintiff cannot establish that a dilutive result occurs under § 2, plaintiff's equal protection claim also fails"). Again, because the plaintiffs here have adduced proof of the "dilutive effect"—a Latino candidate of choice, who would prevail in the proposed district, would lose in the existing district—these cases are inapposite.

(9th Cir. 1990). Indeed, Garza explicitly held that "to the extent that Gingles does require a majority showing, it does so only in a case where there has been no proof of intentional discrimination of minority voting strength." Garza, 918 F.2d at 763 (holding that legislature's "intentional splitting of the Hispanic core resulted in a situation in which Hispanics had less opportunity than did other county residents to participate in the political process and to elect legislators of their choice"). The plaintiffs have come forward with evidence, see supra at 7-8—unchallenged by Defendant's summary judgment motion—that the Redistricting Act was developed with the intention of diluting Latino voting strength, and have also come forward with evidence of precisely that effect.[20] They have therefore shown not only a violation of the Equal Protection Clause, but of the Voting Rights Act as well. See, e.g., Nipper v. Smith, 39 F.3d 1494, 1520 (11th Cir. 1994) ("under section 2 as amended, a plaintiff... may demonstrate a violation by showing... the subjective discriminatory motive of legislators"). Accordingly, summary judgment cannot enter on their claim that the Redistricting Act violates the Fourteenth Amendment or the Voting Rights Act.

## Point II
### Given The Evidence That A Latino Candidate Of Choice Could Prevail In The Proposed District, Plaintiffs Do Not Have To Show In Addition That Latino Citizens Constitute A Majority Of The Voting Age Population In That District

Subsequent decisions of the Supreme Court have steered clear of a literal application of Gingles' requirement for success under section 2 of the Voting Rights Act

---

[20] At least one circuit court has suggested that a showing of discriminatory intent alone suffices to prove discriminatory effect, reasoning that "[t]he fact that a statute was enacted with discriminatory intent establishes, at the least, that the legislature hoped and believed the statute would lead to discriminatory results. It would be reasonable for a court to assume, absent proof to the contrary, that the legislature believed correctly, and that the statute indeed resulted in discrimination." Johnson v. DeSoto Cty. Bd. of Comm'rs, 72 F.3d 1556, 1565 (11th Cir. 1996).

that "the minority group must be... sufficiently large and geographically compact to constitute a majority in a... district," 478 U.S. at 50. See Voinovich v. Quilter, 507 U.S. 146, 158 (1993) (assuming valid section 2 claim based on complaint "not that [minority] voters have been deprived of the ability to constitute a **majority**, but of the possibility of being a sufficiently large **minority** to elect their candidate of choice....") (emphasis in original); see also Gingles, 478 U.S. at 89 n.1 (O'Connor, J., concurring in judgment) (minority group's ability to elect candidate of choice could exist even if "not large enough to constitute a voting majority"). Indeed, in declining to address Florida's claim—not unlike that of the Commonwealth here—that "fully half of the Hispanic voting-age residents of the region are not citizens, with the result that several districts in the [plaintiffs'] plan lack enough voters to elect candidates of their choice," the Court noted "the first Gingles condition requires the possibility of creating more than the existing number of reasonably compact districts with a **sufficiently large minority population to elect candidates of its choice**," and therefore it could be proven "**even if Hispanics are not an absolute majority of the relevant population** in the additional districts." Johnson v. DeGrandy, 512 U.S. 997, 1008 (1994) (emphasis added).

These pronouncements make clear that the Gingles court did not come up with the "majority" requirement out of a fetishism for the number fifty, but as an approximation of the potential of a minority group to elect its candidates of choice absent the electoral structure at issue. As Gingles noted, ensuring that minorities who seek the protections of the Voting Rights Act have that potential is necessary because failing that "**potential...**

they cannot claim to have been injured by that structure...."[21] Gingles, 478 U.S. at 50 n.19 (emphasis in original). Indeed, the DeGrandy court demurred on whether "the relevant figure" for testing the presence of the first Gingles precondition was "the minority group's share of the population, or of some subset of the population, such as those who are eligible to vote, in that they are United States citizens, over 18 years of age, and not registered at another address," explaining that "we do not elevate this proportion to the status of a magic parameter...". 512 U.S. at 1017 n. 14. This Court should reject Defendant's insistence on treating the first Gingles condition as a "magic parameter" equal to fifty percent of the citizens of voting age population as inconsistent with both the purposes of the condition and subsequent Supreme Court precedent.

Lower courts applying the first part of the Gingles test have also focused their analysis on the plaintiffs' potential to elect, rather than subjecting section 2 claims to a Procrustean bed in which a minority population either measures half or more of all voting-age citizens or perishes. One district court, for example, rejected the same "bright-line test" which Defendant urges upon this Court—that "the legal standard for proving the first [Gingles] precondition is a voting age citizen majority"—reasoning that:

> The legal standard is not total population, voting age population, voting age citizenship population, or registration, but the ability to elect.... The dispositive issue is whether, using any of these factual measures, minority plaintiffs are sufficiently numerous in a single member district to be likely to field a cohesive ("effective") voter majority "able to elect" their preferred candidate. That is what the phrase "effective voting majority" means.... The [Gingles] court clearly was measuring the electoral power of the minority districts at issue in the case by whether the ability to elect was present in those districts.

---

[21] In the very opinion announcing the application of the Gingles test to single-member (as opposed to only at-large) electoral districts, the Court noted that "[t]he 'geographically compact majority' and 'minority political cohesion' showings are necessary to establish that a minority has a potential to elect a representative of its choice...". Growe v. Emison, 507 U.S. 25, 40 (1993).

-13-

GSDOCS-1241294-1

Aldosoro v. Kennerson, 922 F.Supp. 339, 371 (S.D. Cal. 1995). The court therefore treated the fact that Hispanics amounted to a majority of all citizens of voting age in the municipality in question as "simply one **evidentiary** method of proving an ability to elect," to be considered together with other facts going to that ability, including, significantly, "election outcome evidence." Id. at 372 (emphasis in original). Only by examining all of these facts, the court recognized, could it "satisfy itself that Hispanics have the **ability to elect** in plaintiffs'… district, that there is a reasonable likelihood that Hispanics will elect their preferred candidate there."[22] Id. at 371 (emphasis in original).

Here, Defendant has come forward with evidence that Latinos do not form a majority of the citizens of voting age in the proposed district. The plaintiffs, however, have responded with their own evidence, in the form of reaggregated election results, that a candidate preferred by Latinos would likely prevail in the proposed district. See Engstrom Aff. ¶ 31. An issue of fact therefore exists as to whether the proposed district would be home to "a sufficiently large minority population to elect candidates of its choice," DeGrandy, 512 U.S. at 1008, making resolution of the plaintiffs' Voting Rights Act claim on summary judgment inappropriate. See Westwego Citizens for a Better Gov't v. City of Westwego, 906 F.2d 1042, 1046-47 (5th Cir. 1990) (reversing district court's entry of judgment for defendant to section 2 claim, based solely on the inability of blacks to constitute a majority in any single-member district, and remanding for

---

[22] Indeed, more recent authorities tend to follow this approach. See, e.g., Martinez v. Bush, 234 F.Supp.2d 1275, 1322 (S.D. Fla. 2002) (three-judge court) (rejecting approach of "focusing mechanically on the percentage of minority population (or a voting age population or registered voters) in a particular area" in favor of ascertaining whether "the district is drawn in a manner likely to result in the election of minority candidates of choice in most elections" to determine compliance with Gingles); Note, The Future of Minority-Majority Districts in Light of Declining Racially Polarized Voting, 116 Harv. Law Rev. 2208, 2217-18 (2003) (criticizing use of minority majority figures to predict electoral success as "too simplistic: no one percentage will guarantee minority voters an equal opportunity in every district, because each district is unique").

consideration of evidence "that blacks would have been able to elect the black candidate" in the prior election absent the challenged structure); Romero v. City of Pomona, 665 F.Supp. 853, 857 (C.D. Cal. 1987) (despite fact that none of plaintiffs' proposed districts contained majority of voting age citizens who were minorities, entering summary judgment for defendant on section 2 claim only after reviewing "record of past elections," which failed to show that the plaintiffs' plan "would improve the electability of minority candidates in comparison to the current… system"). The plaintiffs, through Professor Engstrom's analysis of past elections, have presented evidence of that they would have been able to elect a Latino candidate from the proposed district.[23] Furthermore, one of Defendant's own experts, in a report submitted in another case, opined that "[r]epeatedly, we see evidence that Hispanics do not need a majority to elect Hispanic candidates. Once Hispanics surpass this 43% threshold among the voters casting ballots, Hispanic candidates regularly win." See Deposition of Peter Morrison, April 29, 2003, at 107, Ex. 59. Accordingly, there remains, at a minimum, a triable issue of fact as to the presence of the first Gingles condition, which itself requires the denial of Defendant's motion.

The cases relied upon by Defendant in no way support the opposite result, as the plaintiffs there—in contrast to the plaintiffs here—do not appear, by and large, to have come forward with any evidence as to their ability to elect candidates of their choice notwithstanding their inability to constitute more than 50 percent of the citizens of voting age in a particular district. See, e.g., Magnolia Bar Ass'n v. Lee, 994 F.2d 1143, 1150 n. 14 (5th Cir. 1993) (noting that plaintiffs "consisténtly maintained that they [were] being

---

[23] Engstrom has also concluded that "Latino voters in the [Second] Suffolk district, and in Chelsea, have had a preference, demonstrated by their voting behavior, to be represented by Latino candidates." Engstrom Aff. ¶ 28.

deprived of the ability to constitute a majority," and not that they could elect a preferred candidate absent a majority); Brewer v. Ham, 876 F.2d 448, 455 (5th Cir. 1989) (upholding judgment for defendant on section 2 claim where the "evidence demonstrates no basis for finding that anything less than a district including a majority of minority voters would yield them the effective participation in… elections contemplated by the first prong of [Gingles]").[24] Indeed, a careful examination of Defendant's authorities reveals that, in most cases, courts have simply treated the requirement of a majority-minority district as a proxy for ensuring that, as contemplated by Gingles, the minority group has the potential to elect a candidate of its choice.

For example, in Hastert v. State Bd. of Elections, 777 F.Supp. 634 (N.D. Ill. 1991), the court identified "proof of injury" and "fashioning an effective remedy" as the concerns underlying the first Gingles precondition, and proceeded to reject an alternative districting plan which would have created a district with a minority voting age population of less than five percent given the absence of any other "meaningful substantive evidence in support of the dilution claim." Id. at 653-55. Here, in contrast, the plaintiffs have adduced substantive evidence that, while Barrios would have lost his 2002 race if conducted in the existing Second Suffolk, he would likely have won that election in the proposed district. See Engstrom Aff. ¶¶ 30-31. This evidence provides both the "proof of injury" and availability of "an effective remedy" for which the Gingles "effective majority" requirement serves as a proxy. Dismissing the plaintiffs' section 2 claims

---

[24] DeBaca v. County of San Diego, 794 F.Supp. 990 (S.D. Cal. 1992), also cited by Defendant, does not appear to have considered at all whether, in the absence of a majority of Latino voters, a section 2 claim could still satisfy the first Gingles condition, but merely rejected the plaintiffs' argument—foreclosed, in any event, by Growe—that the Gingles analysis did not apply to single-member elections. Id. at 997.

despite this evidence, merely because Latinos cannot form a majority of the citizen voting age population in the proposed district, does nothing to further the goals of Gingles.[25]

Finally, analyzing evidence of the first Gingles precondition beyond the mere ethnic composition of voting age citizens in the proposed district follows the First Circuit's teaching in Vecinos De Barrio Uno v. City of Holyoke, 72 F.3d 973 (1st Cir. 1995). While the Uno court did not speak to the issue of whether a minority group making up less than half of the population could suffice for purposes of the first Gingles condition, its decision to remand the case for to consider the impact of a 26 percent Latino voting age district on the dilutive effect of the challenged scheme proceeded from a recognition that "the voting strength of a minority group is not necessarily limited to districts in which its members constitute a majority of the voting age population...". Id. at 990. It would be anomalous to push away with one arm indicators of electoral ability beyond citizenship voting age population when they tend to show actionable dilution under section 2, while embracing those same indicators with the other arm when they tend to show the opposite. The Court should reject the theory underlying Defendant's summary judgment motion, which generates tension with the Circuit's decision in Uno.[26]

---

[25] Hastert and other cases also reason that "an unrestricted breach of the Gingles single-district majority precondition will likely open a Pandora's box of marginal Voting Rights Act claims by minority groups of all sizes." 777 F.Supp. at 654 (citing McNeil v. Springfield Park Dist., 851 F.2d 937 (7th Cir. 1988)). Given the plaintiffs' specific evidence of predicted electoral success, however, the lid on Pandora's box will remain secure despite the denial of Defendant's summary judgment motion. Cf. McNeil, 851 F.2d at 944 (refusing to depart from strict majority-minority requirement despite assertion that hypothetical race involving more than two candidates might permit election of minority-preferred candidate with plurality).

[26] By the same token, accepting the plaintiffs' theory does not require resolution of whether the Voting Rights Act contemplates claims of "influence dilution." See Uno, 72 F.3d at 979 n.2 (noting that Supreme Court has repeatedly declined to address the issue, which divides lower courts). As the First Circuit explained in Uno, in a minority "influence district," minority voters join with others to elect representatives who "serve, at least in part, the interest of the minority community and vie for its support." Id. at 991 n.13. Here, in contrast, the plaintiffs have produced evidence of their ability to elect a Latino candidate of choice who is clearly not the candidate of choice of white voters. See Engstrom Aff. ¶¶ 30-31. The success of their section 2 claim, then, does not depend on the viability of an "influence district" cause of action.

### Point III
### Given The Evidence That Discrimination Has Kept
### Naturalization Low Among Latinos In The Boston Area,
### Citizenship Is An Inappropriate Standard For The Voting Rights Act Claim

As a result of discrimination at the polls and elsewhere, see Hardy-Fanta Aff. ¶ 2, Ex. A, at 2, Latinos participate in the political process at a lower rate than whites—and pursue naturalization at a lower rate as well. See Patterson Decl. ¶ 2, Ex. 1, at 2; ¶ 3, Ex. 2, at 1. Accordingly, to use citizenship as the measure of the Latino community's ability to maintain an action for vote dilution under section 2 of the Voting Rights Act would, in essence, double the dilutive effect of discrimination upon the Latino voting-age majority in the proposed district: by not naturalizing, Latino non-citizens reduce Latino voting strength not only directly, but also indirectly, by precluding the use of the Voting Rights Act to remedy illegal districting. This outcome eviscerates the protections of the Act for Latino communities, traditionally home to significant numbers of non-citizens, and runs contrary to interpretations of Gingles which have refused to assess the first precondition based on the percentage of minorities among registered voters because "the very lack of minority political power responsible for the bringing of the section 2 action may also act to depress voter registration." Solomon v. Liberty Cty., 865 F.2d 1566, 1574 (11th Cir. 1988), vacated on other grounds on reh'g en banc, 873 F.2d 248 (1989); see also Georgia v. Ashcroft, 195 F.Supp.2d 25, 78 (D.D.C. 2002) ("the [Supreme] Court has cautioned against reliance on voter registration data, which may reflect effects of prior discrimination"), prob. juris. noted, 123 S.Ct. 964 (2003). In Uno, the First Circuit itself noted that "low voter turnout in the minority community may result from the interaction of the electoral system with the effects of past discrimination, which together operate to discourage meaningful electoral participation." 72 F.3d at 986.

GSDOCS-1241294-1

This Court should decline Defendant's invitation to use citizenship voting age population as the standard for the first Gingles precondition, then, for the same reasons that other courts have declined to use registered voter population as the standard. Indeed, the California Supreme Court has explicitly adopted the reasoning of Solomon and like cases in deciding not to test for compliance with the Voting Rights Act based on the citizenship percentages of various minority groups:

> For several reasons we have assumed that citizenship would not be a factor in determining fulfillment of [Gingles]' first prerequisite. Since an application for naturalization resembles voter registration in that both require individual initiative, lack of citizenship is arguably more akin to nonregistration than to underage as a measure of ineligibility to vote.

Wilson v. Eu, 823 P.2d 545, 590 (Cal. 1992); see also League of United Latin Am. Citizens v. North East Ind. Sch. Dist., 903 F.Supp. 1071, 1092 (W.D. Tex. 1995) ("[w]ith regard to the first prong of Gingles, this Court finds, contrary to the defendants' contention otherwise, that the plaintiffs need not show that they constitute a majority of the voting age **citizens** in a proposed single-member district") (emphasis in original). While many of the decisions cited by Defendant adopt citizenship voting age population as the appropriate measure of the first Gingles precondition, none appears to have done so in the face of actual evidence that naturalization among minorities has been suppressed. Cf. Negron v. City of Miami Beach, 113 F.3d 1563, 1568 (11th Cir. 1997) (speculating that "it is unlikely that a significant number of the non-citizen Hispanic residents... would have become citizens if only the City had been districted in a manner making it possible for Hispanics to elect a representative of their choice..."). Here, the plaintiffs have come forward with evidence that experiences of discrimination, including electoral discrimination, reduce the propensity of Latinos to naturalize. See Patterson

Decl. ¶ 3, Ex. 2, at 1. The use of citizenship as a measure of electoral ability is therefore improper.[27] Because Hispanics constitute more than 50 percent of the voting age population of the proposed district, see Harmon Aff. ¶ 2, Ex. A, at 11-12, summary judgment cannot enter for Defendant on the section 2 claim, even if the Court accepts that Gingles requires a minority group to constitute 50 percent of the voting age population.

## CONCLUSION

Defendant's Motion for Summary Judgment should be denied.

MAGALY CAMACHO, et al.,

By their attorneys,

Rudolph F. Pierce (BBO #399380)
Kenneth A. Sansone (BBO #647457)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
(617) 482-1776

Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
294 Washington Street
Boston, MA 02108

OF COUNSEL:
Brenda Wright
NATIONAL VOTING RIGHTS INSTITUTE
27 School Street, Suite 500
Boston, MA 02108

Dated: May 27, 2003

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 5/27/03

---

[27] Indeed, the Ninth Circuit has rejected the use of citizenship data to test the first Gingles prerequisite even in the absence of evidence linking discrimination against Latinos to failure among them to naturalize. See Garza, 918 F.2d at 775 (reasoning that "basing districts on voting population rather than total population would disproportionately affect... rights for people living in the Hispanic district... and would abridge the right of aliens and minors to petition that representative").