UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAGALY CAMACHO et al.

    Plaintiffs,

v.

WILLIAM FRANCIS GALVIN,
in his official capacity as Secretary of the
Commonwealth of Massachusetts,

    Defendant.

Civil Action No. 02-10428-DPW

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, and in opposition to Defendant's Motion for Summary Judgment, the plaintiffs submit this Statement of Material facts as to which there exists a genuine issue to be tried as follows:

1. East Boston is home to the largest Latino population in the city of Boston. See Deposition of Rep. Thomas M. Petrolati ("Petrolati Dep."), April 2, 2003, at 14, 17, 35, Ex. 16, at 6. East Boston has nearly 15,000 Hispanics in its total population of 38,413. See Affidavit of Prof. John E. Harmon ("Harmon Aff.") ¶ 2, Ex. A, at 4.

2. The city of Chelsea is geographically adjacent to East Boston. Compare Subst. Am. Compl. ¶ 14 with Ans. ¶ 14. Two bridges connect East Boston and Chelsea. See Deposition of Rep. Eugene L. O'Flaherty ("O'Flaherty Dep.") at 83.

3. Chelsea has 35,080 residents, of whom nearly 17,000, or 48.4 percent, are Latino. See Harmon Aff. ¶ 2, Ex. A, at 4. Since 1990, the Latino population of Chelsea has increased by 88 percent, while that of East Boston has more than doubled. See id.

4. Aside from these similarities in ethnic composition, East Boston and Chelsea share other socioeconomic characteristics. See Declaration of Prof. John R. Logan ("Logan Decl.") ¶ 2, Ex. 1, at 4. For example, the average East Boston resident lives in a census tract where 10 percent of his or her neighbors have a college education and the median income is $31,211, while the tract inhabited by the average Chelsea resident has a median income of $29,907 and a rate of college education of 9 percent. See id.

5. In Charlestown, only 11.6 percent of the residents, or 1,764 out of the total of 11,946, are Hispanic. See Harmon Aff. ¶ 2, Ex. A, at 4. Nearly 80 percent of the population of Charlestown is white. See id. Charlestown's median household income of $54,638 makes it considerably more affluent than either Chelsea or East Boston. See Logan Decl. ¶ 2, Ex. A, at 1, 3. The median income, employment rate, and percent of residents who own their homes in Charlestown are all higher than those of Chelsea or East Boston, where more people live below the poverty line than in Charlestown. See id.

6. The Latino population of Chelsea votes differently than the overwhelmingly white population of Charlestown. See Affidavit of Professor Richard L. Engstrom ("Engstrom Aff.") ¶ 28. For example, in the 2002 Democratic primary for the Massachusetts senate district which includes both Chelsea and Charlestown, Jarrett Barrios, a Latino, received less than 40 percent of the votes cast in Charlestown. See id. ¶ 26. Anthony Galluccio, his white opponent, received more than 50 percent of those votes. See id. Yet Barrios was the overwhelming choice of Hispanic voters in the district, receiving as much as 95 percent of their vote. See id. ¶ 11.

7. In the 2002 election, Galluccio had the support of Rep. Eugene O'Flaherty, whose district, the Second Suffolk, is at issue in this case. See O'Flaherty Dep. at 106. Rep. O'Flaherty testified that, while he remembered some issues in the Barrios-Galluccio race, the only issue on which the candidates disagreed was "something about charter schools." Id. at 108-109.

8. In the 2001 elections, Felix Arroyo—a Latino running against six white opponents for an at-large seat on the Boston city council—finished next-to-last among Charlestowners, garnering less than 15 percent of their vote. See Engstrom Aff. ¶ 27.

9. Latinos in Chelsea have demonstrated a preference for representation by Latino candidates, particularly in school committee elections. See id. ¶ 28. For example, Gabriel Valerio (a Latino) received more than 70 percent of the Latino vote in 2001. See id. ¶ 14. Magaly Valentin (also a Latino) got 86 percent of the Latino vote in 1997. See id. ¶ 20. Latino voters produced similar results in the 2001 at-large election for Chelsea city council, where Roy Avellaneda (a Latino) received 97 percent of the Hispanic vote. See id. ¶ 23.

10. The Latino residents of Chelsea have also endured a longstanding pattern of obstacles to their full participation in the political process. See Decl. of Prof. Carol Hardy-Fanta ("Hardy-Fanta Decl."), ¶ 2, Ex. 1, at 2.

11. Under the city's at-large system for electing members of the Chelsea school committee, only one Latino has ever been elected to the body, despite the fact that the majority of children in the Chelsea public schools are Latino. See Vega Aff. ¶ 5. This results from white voters in Chelsea voting as a bloc against Latino candidates, who

-3-

GSDOCS-1242787-1

7. In the 2002 election, Galluccio had the support of Rep. Eugene O'Flaherty, whose district, the Second Suffolk, is at issue in this case. See O'Flaherty Dep. at 106. Rep. O'Flaherty testified that, while he remembered some issues in the Barrios-Galluccio race, the only issue on which the candidates disagreed was "something about charter schools." Id. at 108-109.

8. In the 2001 elections, Felix Arroyo—a Latino running against six white opponents for an at-large seat on the Boston city council—finished next-to-last among Charlestowners, garnering less than 15 percent of their vote. See Engstrom Aff. ¶ 27.

9. Latinos in Chelsea have demonstrated a preference for representation by Latino candidates, particularly in school committee elections. See id. ¶ 28. For example, Gabriel Valerio (a Latino) received more than 70 percent of the Latino vote in 2001. See id. ¶ 14. Magaly Valentin (also a Latino) got 86 percent of the Latino vote in 1997. See id. ¶ 20. Latino voters produced similar results in the 2001 at-large election for Chelsea city council, where Roy Avellaneda (a Latino) received 97 percent of the Hispanic vote. See id. ¶ 23.

10. The Latino residents of Chelsea have also endured a longstanding pattern of obstacles to their full participation in the political process. See Decl. of Prof. Carol Hardy-Fanta ("Hardy-Fanta Decl."), ¶ 2, Ex. 1, at 2.

11. Under the city's at-large system for electing members of the Chelsea school committee, only one Latino has ever been elected to the body, despite the fact that the majority of children in the Chelsea public schools are Latino. See Vega Aff. ¶ 5. This results from white voters in Chelsea voting as a bloc against Latino candidates, who

nevertheless receive a high degree of support from the Latino electorate. See Engstrom Aff. ¶ 28.

12. Despite requests from the Latino community, the city council has refused to take the necessary steps to switch to a system of electing school committee members by district. See Vega Aff. ¶¶ 5-6.

13. Of the city's five wardens for each of the 1997, 1999, 2000, 2001, and 2002 elections, the Chelsea city clerk could identify but one Latino. See Deposition of Robert H. Bishop, April 17, 2003 ("Bishop Dep.") at 26-39. None of the ten clerks who worked on any of those five elections was Hispanic. See id. at 26-39. One warden is responsible for overseeing the polling places—each of which is overseen by a clerk—in each ward on election day. See id. at 28. Chelsea has a tradition of allowing wardens and clerks to appoint their successors—and the city clerk has never encouraged the appointment of a Latino for either of these positions. See id. at 40-41.

14. Latinos in Chelsea have experienced difficulties in voting in municipal elections, including being asked for identification at the polls on a more frequent basis than whites, being told that their names did not appear on the voter list, see Vega Aff. ¶ 3-4, and having to interact with poll workers who do not speak Spanish. See Bishop Dep. at 32-33. Chelsea's wardens and clerks have been trained on issues affecting Latino voters at the polls only once, for twenty or thirty minutes, and at that came at the insistence of Hispanic organizations in the city in 2001. See id. at 67-71.

15. Latinos in Chelsea also suffer race-based discrimination in housing, health, education, and employment. See Hardy-Fanta Decl. ¶ 2, Ex. 1, at 2.

GSDOCS-1242787-1

16. Experiences of discrimination have discouraged Latinos from participating in the political process. See Declaration of Prof. Thomas E. Patterson ("Patterson Decl.") ¶ 2, Ex. 1, at 2. Experiences of discrimination also reduce the propensity of Latino non-citizens to naturalize and otherwise hinders their pursuit of citizenship. See id. ¶ 3, Ex. B, at 1.

17. Before the passage of the Redistricting Act, Chelsea's Commission on Hispanic Affairs (the "Commission") and other members of the city's Latino community asked the Joint Special Committee on Redistricting, co-chaired by Rep. Petrolati, not to divide Chelsea into multiple house districts. See Def. Statement Undisp. Facts ¶ 11, Ex. A. The Committee's official moniker was the "Joint Special Committee Established to Make an Investigation and Study of a New Division of the Commonwealth into Congressional Districts, Forty Senatorial Districts, Eight Councilor Districts and One Hundred Sixty Representative Districts." See Petrolati Dep. at 14, 16-17, Ex. 16.

18. In a September 19, 2001 letter to Rep. Petrolati, the Commission proposed that all of Chelsea be placed in a single district together with one precinct (necessary because the population of Chelsea was slightly less than that needed to constitute a district unto itself) from an adjacent area of East Boston. See Def. Statement Undisp. Facts ¶ 11, Ex. A. That district would have had more minorities than whites. See Harmon Aff. ¶ 2, Ex. A, at 10-11. Among the 28,132 people of voting age in the proposed district, 43 percent, would have been Hispanic, while nearly 56 percent would have been minority. See id. As an alternative, the letter proposed that all of Chelsea be combined with one adjacent precinct from Charlestown, which also would have resulted in a majority-minority district. See Def. Statement Undisp. Facts ¶ 11, Ex. A.

GSDOCS-1242787-1

19. The Committee also received a letter from Charlestown resident Denise Marie Devlin, accompanied by a number of postcards signed by other Charlestown residents, asking that Charlestown not be divided into multiple House districts. See Petrolati Dep. at 67-69, Exs. 19A and 19B.

20. In the Redistricting Act which became law on November 8, 2001, the Legislature placed three-quarters of Chelsea and all of Charlestown together in one district, known as the Second Suffolk. Compare Subst. Am. Compl. ¶¶ 17, 19 with Ans. ¶¶ 17, 19. Two of the four Chelsea precincts excluded from the Second Suffolk, and placed together with Revere in the Sixteenth Suffolk, had Hispanic populations exceeding 40 percent. See Harmon Aff. ¶ 2, Ex. A, at 8.

21. In the Second Suffolk, only 43 percent of the residents of voting age are minorities—and Hispanics comprise only 32.3 percent of the voting-age population. See id. at 8-9. This creates an atmosphere in which whites, who form a two-thirds majority of the district's voting age population, will usually defeat the choices of their Latino counterparts at the ballot box. See Engstrom Aff. ¶ 29. For example, a reaggregation of returns from the 2002 state senate race demonstrates that, had Barrios run for that office from a district consisting solely of Charlestown and those parts of Chelsea which make up the Second Suffolk, he would not have received a majority of the vote. See id. ¶ 30.

22. Placing five precincts from East Boston in a district together with eleven precincts from Chelsea, however, creates a district where a Latino candidate has a more reasonable chance of defeating a white opponent. See id. ¶ 31 (analyzing "plaintiffs' illustrative district," described at Harmon Aff. ¶ 2, Ex. A, at 11-12). Barrios, for example, would likely have won a majority of the votes in this district (the "proposed

district"). See id. In the proposed district, 14,120 of the 27,841 residents of voting age, or nearly 51 percent, are Latino, and 17,547, or 63 percent, are minorities. See Harmon Aff. ¶ 2, Ex. A, at 12.

23. The proposed district satisfies traditional redistricting principles of compactness and contiguity. See id. at 13. It hews more closely to accepted redistricting standards designed to maintain the "one person, one vote principle" than the existing Second Suffolk: the total population of the proposed district deviates from the ideal by only 2.5 percent, while that of the enacted Second Suffolk deviates by nearly 5 percent. See id. at 5, 9, 12. Its implementation would involve shifting less than five percent of all precincts in the Commonwealth from the House districts in which they are located under the Redistricting Act. See id. at 13. Charlestown, for example, would join precincts from the North End of Boston in a reconstituted Third Suffolk district under the proposed plan. See Harmon Aff. ¶ 2, Ex. A, at 11 & App. 5.

24. In its October 18, 2001 report on the Redistricting Act, the Joint Special Committee claims to have

> conducted a number of public hearings, met with scores of groups representing various constituencies across the commonwealth, spoken with elected officials, attended conferences on the subject of redistricting and reapportionment, and engaged in ongoing correspondence—electronic, print and telephone call—with individuals interested in the redistricting process.

Petrolati Dep. at 14, 17, 35, Ex. 16, at 4.

25. Outside of five public hearings held at different locations across the state, the Committee did not meet with any group in connection with the redistricting process.. See id. at 20-21. The Committee also did not engage in any "ongoing correspondence" with members of the public, but simply received written correspondence from them

without responding. See id. at 21-22. Neither Rep. Petrolati nor anyone on this staff spoke to any member of the public by telephone about the redistricting process. See id. at 26-27.

16. The only meetings held during the creation of the Redistricting Act to which Rep. Petrolati testified were his personal conferences with each of the members of the House whose district might be affected, see id. at 24-25—including Rep. O'Flaherty of the Second Suffolk, who used the meeting to provide input about his district. See id. at 48-49. Rep. O'Flaherty "would like [his] district to stay substantially similar to the district that [he] ran for in 1996 and [he is] currently the representative of today." See O'Flaherty Dep. at 124.

17. Since none of the three Latino members of the House represents a district which includes any part of Suffolk County, the Committee did not speak to any Latino from Chelsea or elsewhere in the county about the development of the Redistricting Act. See Petrolati Dep. 51-53.

18. There are 14,120 Hispanics of voting age in the proposed district in its entirety, of whom some 10,545 reside in those tracts and block groups included in the district in its entirety. See Harmon Aff. ¶ 7. There are therefore 3,575 Hispanics of voting age in block groups which are split by the lines of the proposed district. See id.

19. The citizenship level of this remaining Hispanic voting age population (3,575) can be estimated by assuming a level of citizenship among them based on levels found in those tracts and block groups completely encompassed within the Second Suffolk. See id. ¶ 8. Within that area, there is a considerable range in the percentage of Hispanic voting age population who are citizens; the lowest percentage is 3.17% (Tract

GSDOCS-1242787-1

501, Block Group 1) and the highest is 81.63% (Tract 605, Block Group 5). See id. The average percentage of Hispanics of voting age who are citizens is 38.26% for the tracts and block groups wholly included within the proposed Second Suffolk. See id.

20. The Brace Supplemental Report of April 4, 2003 estimated 15,559 citizens of voting age in the proposed district. See Affidavit of Kimball William Brace ¶ 4, Ex. B. Using that as the base for the percentage column in the following tables and Brace's percentage range estimates for Hispanic citizen voting age population, results in the following range of estimates for Hispanic voting age citizenship percentages ("HCVAP") within the proposed district:

*Low Extreme* – This calculation is based on the lowest HCVAP found in the completely included tracts and blocks, 3.17% and the low and high HCVAP numbers based on the error ranges reported in the Brace Affidavit (Table 1). The 3.17% figure is used for the 3,575 Hispanics of voting age in the split districts. The HCVAP number is calculated by adding to that number the Hispanic voting age citizens in completely included tracts and block groups as estimated based on sampling errors (Table 1). The Percent of Citizenship VAP column uses 15,599 (estimated number of citizens of voting age from Exhibit 12 to Brace's Supplemental Report) as its denominator:

| **Table 2** | 3.17% Hispanic VAP Citizenship in Split Block Groups | | | |
|---|---|---|---|---|
| | Hispanic CVAP | | Percent of Citizen VAP | |
| | Low | High | Low | High |
| Conservative | 4,093 | 4,204 | 26.24% | 26.95% |
| Less Conservative | 4,084 | 4,213 | 26.18% | 27.01% |
| Most Extreme | 4,045 | 4,251 | 25.93% | 27.25% |

GSDOCS-1242787-1

**Average** – *This set of estimates is based on the average rate of HCVAP for the completely included tracts and block groups as reported in the Brace Affidavit, 38.26%.*

| Table 3 | 38.26% Hispanic VAP Citizenship in Split Block Groups | | | |
|---|---|---|---|---|
| | Number | | Percent of Citizen VAP | |
| | Low | High | Low | High |
| Conservative | 5,347 | 5,458 | 34.28% | 34.99% |
| Less Conservative | 5,338 | 5,467 | 34.22% | 35.05% |
| Most Extreme | 5,300 | 5,506 | 33.98% | 35.30% |

There was one block group where more than 80% of the Hispanics of voting age are citizens; applying that figure results in the following estimates:

| Table 4 | 81.63% Hispanic VAP Citizenship in Split Block Groups | | | |
|---|---|---|---|---|
| | Number | | Percent of Citizen VAP | |
| | Low | High | | |
| Conservative | 6,898 | 7,009 | 44.22% | 44.93% |
| Less Conservative | 6,889 | 7,018 | 44.16% | 44.99% |
| Most Extreme | 6,850 | 7,056 | 43.92% | 45.23% |

See Harmon Aff. ¶ 9.

21. The HCVAP percentages calculated using this methodology, rather than the disaggregation technique used by Brace, produces a wider range of HCVAP percentage estimates with the lowest at 25.93% and the highest at 45.23%. See id. ¶ 10. If the Hispanic voting age population in the split block groups had the same rate of citizenship as that in the tracts and block groups completely included in the proposed Second Suffolk, (38.26%) the HCVAP estimates would range from a low of 33.98% to a high of 35.30%. See id. If 81.63% of the voting age Hispanics in the split block groups were citizens, as was the case with block group 5 of tract 1605, the HCVAP percentages would range from a low of 43.92% to a high of 45.30%. See id. This estimation methodology yields a range of estimates (25.93% to 45.23%) with a mid-point of 35.58%. See id.

GSDOCS-1242787-1

MAGALY CAMACHO, et al.,

By their attorneys,

*[signature]*

Rudolph F. Pierce (BBO #399380)
Kenneth A. Sansone (BBO #647457)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
(617) 482-1776

Nadine Cohen (BBO #090040)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
294 Washington Street
Boston, MA 0210

Dated: May 27, 2003

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party ~~by mail~~ (by hand) on 5/27/03.

*[signature]*